**NERI v. UNITED STATES.**

United States District Court
S. D. New York.

Nov. 2, 1951.

Paul C. Matthews, New York City, John J. Robinson, New York City, of counsel, for libelant.

Myles J. Lane, U. S. Atty., New York City, Benjamin H. Berman, Attorney, Department of Justice, New York City, of counsel, for respondent.

GODDARD, District Judge.

This is a suit brought under the Public Vessels Act, Title 46 U.S.C.A. § 781, in which the libelant seeks an award for salvage services allegedly rendered to respondent.

The libelant Tito Neri is an Italian national and resident who does business in Italy under the name of Impresa Di Salvataggi Fratelli Neri [Neri Brothers Salvage Enterprise]. At the time the salvage services were allegedly rendered, libelant was the owner of three tugboats; the Luigi, the Nettuno, and the Meloria.

The respondent was the owner of the Signal Hills, a T–2 tanker. On February 15, 1945, this vessel, title to which was held by the War Shipping Administration, was delivered to Pacific Tankers, Inc., as general agent of the United States under the usual form of GAA agreement. During the period with which we are concerned, the Signal Hills was allocated to the United States Navy.

On October 8, 1946, the Signal Hills, after discharging a cargo of oil for the Navy at Vado Lagure, Italy, was proceeding in ballast to Bahrein in the Persian Gulf to take on another cargo of oil for the Navy. At approximately 0600, there was an explosion, apparently caused by the vessel's striking a mine. The ship's log showed her position at that time to be a few miles within a mined area and about 25 miles from Livorno [Leghorn], Italy.

After examining the damage, the master decided that there was no danger of the vessel's sinking but radioed to the United States Naval Authorities in Rome for assistance. The Naval authorities notified the local authorities at the port of Livorno of the Signal Hill's need of assistance. The port commander, an Italian Naval Officer, ordered the libelant to send tugs to aid her.

The libelant then dispatched his tugs to the Signal Hills.

The Signal Hills proceeded under her own power at half speed for about forty-five minutes. Then, the master, believing that the vibrations caused by the use of her engines endangered the vessel, ordered the engines stopped. At all times thereafter until taken in tow, the Signal Hills drifted. There was evidence which tended to indicate that she drifted toward the minefield.

At approximately 1240 the Signal Hills was taken in tow by an Italian mine sweeper, the D-211, and very shortly thereafter by the libelant's tug, the Luigi G. There was a sharp conflict in the testimony as to whether the Signal Hills was still in the minefield at the time she was taken in tow by the Luigi G. In the view I take of this case, it is unnecessary to decide this question.

After a short time, the D-211 cut her tow line. A United States Army tug, ST-333, took a tow line but at 1500 she too cut her line because of engine difficulties.

Libelant's second tug, the Nettuno, took a tow line at 1330 and a third tug, the Meloria, also belonging to libelant, took another line at 1645. Thereafter and until the Signal Hills was safely docked in Livorno at approximately 2100, the libelant's three tugs towed and assisted her.

The respondent contends that (1) a state of war existed between Italy and the United States on October 8, 1946, and, under the terms of the Treaty of Peace signed on February 10, 1947, and ratified on June 14, 1947, and which became effective on September 15, 1947, 61 Stat. 1245, the Italian Government, on behalf of itself and its nationals, waived any claim libelant may have had against the United States, 61 Stat. 1245, 1401; (2) By agreement entered into on August 14, 1947, between the United States and Italy, the United States was discharged from liability for salvage claims where the alleged services were rendered to public vessels of the United States; and (3) Even if libelant's claim were not waived by the Treaty of Peace and/or the Memorandum of Under-standing, the libelant is not entitled to any award because the alleged salvage services were not voluntarily rendered.

■■ I think that the respondent's contention that libelant's claim is barred by the Treaty of Peace and the 1947 Memorandum of Understanding must be sustained.

Part VI of the Treaty of Peache with Italy, 61 Stat. 1245, 1397, relates to claims arising out of the war. Section III thereof concerns renunciation of claims by Italy. Article 76 of this section, 61 Stat. 1245, 1401, provides as follows:

"1. Italy *waives* all claims of any description against the Allied and Associated Powers on behalf of the Italian Government or Italian nationals arising directly out of the war or out of actions taken because of the existence of a state of war in Europe after September 1, 1939, whether or not the Allied or Associated Power was at war with Italy at the time, including the following:

"(a) Claims for losses or damages sustained as a consequence of acts of forces or authorities of Allied or Associated Powers;

"(b) Claims arising from the presence, operations, or actions of forces or authorities of Allied or Associated Powers in Italian territory;

\* \* \* \* \* \*

"2. The provisions of this Article shall bar, *completely and finally*, all claims of the nature referred to herein, which will be henceforward *extinguished*, whoever may be the parties in interest. The Italian Government agrees to make equitable compensation in lire to persons who furnished supplies or services on requisition to the forces of Allied or Associated Powers in Italian territory and in satisfaction of non-combat damage claims against the forces of Allied or Associated Powers arising in Italian territory." [Emphasis supplied.]

This Treaty was dated February 10, 1947, and was ratified by the Senate of the United States on June 14, 1947. Libelant's claim, arising out of the assistance rendered to the Signal Hills on October 8, 1946, falls with-

in the purview of this treaty and is therefore barred.

It is a claim that is covered by the provisions of paragraph 1(b) as a claim arising from the presence, operations, or actions of forces or authorities of the United States.

Libelant concedes that the Signal Hills was a public vessel of the United States at all times pertinent to this suit. She was in Italian waters because she had carried fuel to the United States Navy in Italy. The mines had been laid because of the war and the presence and actions of the Allied Powers.

The libelant was ordered by the Port Commander of Livorno to assist the Signal Hills. Although he was in the Italian Navy, he was under the over-all authority of the Allied Forces. He had received his orders to send aid to the Signal Hills from the Allied Authorities in Rome.

It seems obvious that the purpose of the treaty was to free the United States from any claim resulting from the war and/or occupation of Italy.

If there was any doubt that this claim is covered by this treaty, this doubt was removed by the Memorandum of Understanding between the Government of the United States and the Government of Italy signed on August 14, 1947. Cf. the Department of State Bulletin, Vol. XVII, No. 425, August 24, 1947, p. 371. It provides in Article I as follows:

"1. * * *

"2. * * *

"3. * * *

"4. (a) The Government of Italy discharges and agrees to save harmless the Government of the United States of America from any responsibility and liability for the processing, settlement and satisfaction of any claims:

"(i) of Italian nationals, whether or not asserted in the courts of any country, respecting which the ultimate liability is that of the Government of the United States, and arising out of maritime incidents, occurring between September 1, 1939 and the coming into force of the present Memorandum of Understanding, excluding incidents involving ships engaged in purely commercial activities; * * *".

Since it is conceded that the Signal Hills was a public vessel and not engaged in purely commercial activities, the claim now before the court would seem to be specifically covered by this provision.

However, the libelant contends that this treaty does no more than to provide that Italy will reimburse the United States if it incurs liability through any means covered by the treaty but that the United States must first process any such claim, satisfy it, and then seek indemnity from Italy.

This argument ignores the plain meaning of the words used in the treaty. The treaty provides that Italy "waives all claims", that this treaty "shall bar, completely and finally, all claims * * *, which will be henceforward extinguished * * *". The title of this section of the treaty is "Renunciation of claims by Italy". It is hard to imagine how this treaty could be worded to make it more emphatic that it was the purpose of the treaty to completely end these claims as far as the United States was concerned. The terms of the treaty were intended to be liberal but it seems highly unlikely that any victorious nation would allow the nationals of the defeated nation to sue the victor on claims arising from the war or occupation.

The Memorandum of Understanding referred to above makes this interpretation of the treaty seem clear. The Memorandum specifically provides for renunciation of claims and provides that "Italy further discharges and agrees to save harmless from any responsibility for the processing, settlement and satisfaction of any such claims * * *". Had it been the purpose of the framers of this treaty to merely provide for indemnity, they would have explicitly said so. They would not have used the words "waives" and "discharges" nor would they have mentioned processing and settlement of such claims. As a result of this treaty, the United States is in no way responsible for either processing or settling the claims. The Government of Italy is now completely responsible.

The libel is therefore dismissed.