## NERI v. UNITED STATES.

### No. 243, Docket 22663.

United States Court of Appeals
Second Circuit.

Argued April 13, 1953.

Decided June 3, 1953.

John J. Robinson, New York City (Paul C. Matthews, New York City, on the brief), for libellant-appellant.

Benjamin H. Berman, Attorney, Department of Justice, New York City (Myles J. Lane, U. S. Atty., New York City, on the brief), for respondent-appellee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The tanker Signal Hills, owned by the United States, was in 1946 allocated to the United States Navy. In October, having brought a cargo of oil from Texas to Vado Lagure in the Gulf of Genoa, consigned to the United States Military Forces, she then sailed light, under orders to pick up another cargo in the Persian Gulf. But she had been at sea only a few hours when in the early morning of October 8, 1946, she struck

a mine and was badly damaged by the resulting explosion. The mined area had been known and charted, but the master appears to have brought the vessel within the lower extremity of one of the danger areas near Livorno (Leghorn), Italy. She sent for help and her call, relayed through the United States Naval Command at Rome to an Army officer at Livorno and thence through the Italian Commandant at the latter Port, eventually led to orders to the libellant, operator of a salvaging concern, to send his tugboats to her aid. Two tugs reached the tanker about 6½ hours after she struck the mines. The tugs, with the help of an Italian naval vessel and a United States Army tug, towed the tanker approximately 25 miles to Livorno, where they were met by a third tug of libellant with a pilot; and the tanker was then docked. It is on the claim of salvage services rendered by his three tugs that libellant, an Italian resident and national, brought this action against the United States of America.

Originally the libellant alleged that the Signal Hills was a merchant vessel and that the suit was brought under the provisions of the Suits in Admiralty Act, 46 U.S.C. § 741 et seq. But at the close of the trial it was conceded, and the parties stipulated, that at the time involved she was a public vessel of the United States and the action proceeded as one under the authority of the Public Vessels Act, 46 U.S.C. § 781. Thus there arises no question here such as was considered in Calmar S. S. Corp. v. United States, 345 U.S. 446, 73 S.Ct. 733, 735, where a privately owned vessel operated for hire for the United States was held to be "employed as a merchant vessel," to give the Court jurisdiction under the Suits in Admiralty Act, though she was carrying "war matériel" on a war mission, since the nature of the cargo is not the criterion for determining jurisdiction. Respondent, defending, asserted that the action was barred by the terms of the Treaty of Peace and a supplemental agreement between this country and Italy; it also contended that no salvage was due because the services were not performed voluntarily, but only under orders from military authorities transmitted through the Commandant at the Port of Livorno. Judge Goddard after trial held for the respondent on the first point in a reasoned opinion, D.C.S.D.N.Y., 102 F. Supp. 718, but did not find it necessary to pass upon the second point. We agree and shall confine our consideration to the first issue.

The state of war, between the United States and Italy, declared on December 11, 1941, 55 Stat. 797, 50 U.S.C.Appendix, p. 7, still continued at the time of the accident here. The Treaty of Peace between the nations was entered into on February 10, 1947, was ratified on June 14, 1947, and became effective September 15, 1947, 61 Stat. 1245, U.S.Code Cong.Serv.1947, p. 2321. Section III relates to the renunciation of claims by Italy and provides in Article 76, 61 Stat. 1245, at 1401:

"1. Italy waives all claims of any description against the Allied and Associated Powers on behalf of the Italian Government or Italian nationals arising directly out of the war or out of actions taken because of the existence of a state of war in Europe after September 1, 1939, whether or not the Allied or Associated Power was at war with Italy at the time, including the following:

"(a) Claims for losses or damages sustained as a consequence of acts of forces or authorities of Allied or Associated Powers;

"(b) Claims arising from the presence, operations, or actions of forces or authorities of Allied or Associated Powers in Italian territory;

\*    \*    \*    \*    \*    \*

"(d) Claims arising out of the exercise or purported exercise of belligerent rights.

"2. The provisions of this Article shall bar, completely and finally, all claims of the nature referred to herein, which will be henceforward extinguished, whoever may be the parties in interest. The Italian Government agrees to make equitable compensation in lire to persons who furnished supplies or services on requisition to the forces of Allied or Associated Powers in Italian territory and in satisfaction of non-combat damage claims against the forces of Allied or Associated Powers arising in Italian territory."

Thereafter on August 14, 1947, the United States and Italy entered into a Memorandum of Understanding "regarding settlement of certain wartime claims and related matters." Therein, in reaffirmation of Article 76 of the Treaty of Peace, the Government of Italy "waives" all claims of any description arising out of the war, Art. I, subd. 1(a), and "further discharges and agrees to save harmless the Government of the United States of America from any responsibility and liability for the processing, settlement and satisfaction of any such claims of Italian nationals." Id. subd. 1(b). The Memorandum continues in id. subd. 4(a):

"4. (a) The Government of Italy discharges and agrees to save harmless the Government of the United States of America from any responsibility and liability for the processing, settlement and satisfaction of any claims:

"(i) of Italian nationals, whether or not asserted in the courts of any country, respecting which the ultimate liability is that of the Government of the United States of America, and arising out of maritime incidents, occurring between September 1, 1939 and the coming into force of the present Memorandum of Understanding, excluding incidents involving ships engaged in purely commercial activities; * * *."

These provisions seem clearly broad enough to bar the present claim. Conceivably it might be possible to read the Treaty provisions as referring only to claims for damage done to Italians, not by the Italian Government to property of our Government. But this seems a more narrow reading than the language employed will justify. Thus in subd. 2 of Article 76 of the Treaty the Italian Government agrees to compensate "persons who furnished supplies or services on requisition" to the Allied forces and "in satisfaction of non-combat damage claims" against Allied forces in Italian territory. These claims seem obviously those of Italian nationals; just as obviously they avoid duplicating the claims covered in subd. 1, thus suggesting as wide a coverage, so far as concerns the nature of the claimants, in subd. 1 as in subd. 2. But the broad terms of the Memorandum of Understanding remove all doubt. This contains a specific discharge of claims of Italian nationals. The court has properly found that the damaged tanker was not engaged in purely commercial activities; and this conclusion is controlling, whether the tugs be considered commercially dedicated or not.

Libellant stresses two further contentions. The first is his argument that the tanker's injury, and hence the necessary salvage, was caused proximately by her master's negligence in going into the charted danger zone; on this basis, therefore, the claim sued upon could not be considered one arising out of war actions. This would seem contrary to the Court's findings. In any event it is of no moment, for claims based on negligence are within the all-inclusive language of bar. The second is that, since Italy's obligation is to save the United States harmless from claims of Italian nationals, the case must go forward to a conclusion, with respondent collecting over in the event of a judgment against it. Here, also, the language is too precise to justify such a conclusion. The claims are barred "completely and finally"; and this goes so far as their "processing," "whether or not asserted in the courts of any country."

Libellant asserts that the Treaty was intended to and should be construed generously in Italy's favor, since that country withdrew from the war at a comparatively early date and itself declared war on Germany. But this is particularly noted as a ground of leniency and as a reason for renunciation of various claims by the United States, in Article II of the Memorandum of Understanding itself. The extent of consideration to be granted was surely for the United States to decide in the Treaty and the agreement depending on the Treaty; it was the winner in the war and, as Judge Goddard says, "it seems highly unlikely that any victorious nation would allow the nationals of the defeated nation to sue the victor on claims arising from the war or occupation." 102 F.Supp. at page 720. And the intended bar is of course quite legal and effective. United States v. Chemical Foun-

dation, Inc., 272 U.S. 1, 11, 47 S.Ct. 1, 71 L.Ed. 131; Santovincenzo v. Egan, 284 U.S. 30, 40, 52 S.Ct. 81, 76 L.Ed. 151; Ozanic v. United States, 2 Cir., 188 F.2d 228.

Affirmed.