### In re WORLD WAR II ERA JAPANESE FORCED LABOR LITIGATION.

**This Document Relates To: Alfano v Mitsubishi Corp, CD Cal No 00–3174, Corre v Mitsui & Co, CD Cal No 00–999, Eneriz v Mitsui & Co, CD Cal No 00–1455, Heimbuch, et al. v Ishihara Sangyo Kaisha, Ltd, ND Cal No 00–0064, Hutchison v Mitsubishi Materials Corp, CD Cal No 00–2796, King v Nippon Steel Corp, ND Cal No 99–5042, Levenberg v Nippon Sharyo, Ltd, ND Cal No 99–1554, Levenberg v Nippon Sharyo, Ltd, ND Cal No 99–4737, Poole v Nippon Steel Corp, CD Cal No**

00–0189, Price v Mitsubishi Corp., CD Cal No 00–5484, Solis v Nippon Steel Corp., CD Cal No 00–0188, Titherington v Japan Energy Corp, CD Cal No 00–4383, Wheeler v Mitsui & Co, Ltd, CD Cal No 00–2057.

Nos. MDL–1347, 00–3174, 00–999, 00–1455, 00–0064, 00–2796, 99–5042, 99–1554, 99–4737, 00–0189, 00–5484, 00–0188, 00–4383, 00–2057.

United States District Court, N.D. California.

Sept. 21, 2000.

Daniel Girard, Anthony Lee, Gordon Fauth, Jr., Girard & Green, San Francisco, CA, Jay Eisenhofer, John Kairis, Jacob Frankel, Grant & Eisenhofer, Wilmington, DE, Lionel Glancy, Lionel Glancy Law Offices, Los Angeles, CA, David Casey, Jr., Bonnie Kane, Herman, Middleton, Casey & Kitchens, San Diego, CA, Maurey Herman, Herman, Middleton, Casey & Kitchens, New Orleans, LA, James Parkinson, Attorney at Law, Palm Desert, CA, Jeffrey Squire, Jill Manning, Kirby, McInerney & Squire, San Francisco, CA, Kevin Roddy, Hagens Berman, Los Angeles, CA, Steve Berman, Jeffrey Sprung, Hagens Berman, Seattle, WA, John Bartko, William Edlund, Robert Bunzel, Christopher Sullivan, Bartko, Zankel, Tarrant & Miller, San Francisco, CA, William Lerach, Patrick Daniels, Milberg Weiss Bershad Hynes & Lerach, San Diego, California, Albert Meyerhoff, Milberg Weiss Bershad Hynes & Lerach, Los Angeles, CA, Eddie Yoon, Attoney at Law, Lakewood, WA, Joe Reeder, Allen Foster, Ron Klineman, Greenberg Traurig, Washington, DC, Daniel Leib, Law Office of Daniel Lieb, Beverly Hills, CA, Steven Glickman, Glickman & Glickman, Beverly Hills, CA, Haewon Shin, Law Offices of Haewon Shin, Los Angeles, CA, Henry Rossbacher, Rossbacher & Associates, Los Angeles, CA, Robert Swift, Kohn, Swift & Graf, Philadelphia, PA, Scott Wellman, Wellman & Warren, Irvine, CA, Scott Wellman, Wellman & Warren, Laguna Hills, CA, John Van Dyke, Attorney at Law, Honolulu, HI, Edward Fagan, Fagan & D'Avino, New York City, Michael Witti, Law Offices of Michael Witti, Mochen (Bogenhasuen), Germany, Henry Burstyner, Glennen, Burstyner & Co., Australia, Rodrigo Domingo, Jr., Domingo & Dizon, Makati City, Philippines, Joseph Cotchett, Bruce Simon, Steven Williams, Gwendolyn Giblin, Cotchett, Pitre & Simon, Burlingame, CA, Lourdes Tancinco, Tancinco Law Offices, San Francisco, CA, David Scott, Neil Rothstein, Scott & Scott, Colchester, CT, Thomas Galloway, Galloway & Associates, Boulder, CO, Michael Goldstein, Law Offices of Michael Goldstein, Cardiff, CA, Li Yang, Law Offices of Li Yang, New York City, Eli Warach, Attorney at Law, Hackensack, NJ, Howard Finkelstein, Jeffrey Krinsk, Finkelstein & Krinsk, San Diego, California, Jonathan Cuneo, The Cuneo Law Group, Washington, D.C., Venus Soltan, Soltan & Associates, Newport Beach, CA, Matthew Digby, Heidi Leider, Bingham Dana, Los Angeles, CA, Peter Ivan Ostroff, Mark Haddad, Lee Auerbach, Sidley & Austin, Los Angeles, CA, Bruce Johnson, Davis, Wright, Tremaine, Seattle, WA, Martin Fineman, Davis, Wright, Tremaine, San Francisco, CA, Arthur Harrigan, Richard Holmquist, Danielson, Harrigan & Tollefson, Seattle, WA, Robert Sacks, Adam Paris, Sullivan & Cromwell, Los Angeles, CA, Margaret Pfeiffer, Stacey Stoller, Sullivan & Cromwell, Washington, D.C., Arne Wagner, Linda Shostak, Lloyd Aubry, Jr., Kathryn Davis, Morrison & Foerster, San Francisco, CA, Barbara Croutch, Michael Finnegan, Nathan Spatz, Pillsbury, Madison & Sutro, Los Angeles, CA, Shannon Hansen, Mark Cramer, Kirkland & Ellis, Los Angeles, CA, Thomas Yannucci, James Basile, Brant Bishop, Christopher Landau, Kirkland & Ellis, Washington, D.C., Nathan Lane III, Joseph Meckes, Squire Sanders & Dempsey, San Francisco, CA, Michael Rubin, Altshu-

ler, Berzon, Nussbaum, Rubin & Demain, San Francisco, CA, David Balabanian, Thomas Hixon, Eric Pierson, Rebecca Archer, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, Todd Green, O'Melveny & Myers, Newport Beach, CA, John Beisner, John Niblock, O'Melveny & Myers, Washington, D.C., R.R. Fredeking, II, Fredeking & Fredeking, Huntington, WV, Junji Masuda, Masuda & Ejiri, New York City, Douglas Mirell, Loeb & Loeb, Los Angeles, CA, Paul Doyle, Kelley Drye & Warren, New York City, Sabina Helton, Kelley Drye & Warren, Los Angeles, CA, Stephen Bomse, Neil Popovic, Heller Ehrman White & McAuliffe, San Francisco, CA, Catherine Ysrael, Office of the Attorney General of the State of California, Los Angeles, CA, David Anderson, Vincent Garvey, Martha Rubio, Department of Justice Civil Division–Federal Programs Branch, Washington, DC, Michael Engelberg, MD, American Cener for Civil Justice, Brooklyn, NY.

## ORDER NO 4

WALKER, District Judge.

On December 23, 1941, after mounting a brave resistance against an overwhelming foe, the small American garrison on Wake Island in the South Pacific surrendered to Imperial Japanese forces. James King, a former United States Marine, was among the troops and civilians taken prisoner by the invaders. He was ultimately shipped to Kyushu, Japan, where he spent the remainder of the war toiling by day as a slave laborer in a steel factory and enduring maltreatment in a prison camp by night. When captured, King was 20 years old, 5 feet 11 inches tall and weighed 167 pounds. At the conclusion of the war, he weighed 98 pounds.

James King is one of the plaintiffs in these actions against Japanese corporations for forced labor in World War II; his experience, and the undisputed injustice he suffered, are representative. King and the other plaintiffs seek judicial redress for this injustice.

### I

These actions are before the court for consolidated pretrial proceedings pursuant to June 5, 2000, and June 15, 2000, orders of transfer by the Judicial Panel on Multidistrict Litigation. On August 17, 2000, the court heard oral argument on plaintiffs' motions for remand to state court and defendants' motions to dismiss or for judgment on the pleadings.

This order addresses, first, all pending motions for remand. For the reasons stated below, the court concludes that notwithstanding plaintiffs' attempts to plead only state law claims, removal jurisdiction exists because these actions raise substantial questions of federal law by implicating the federal common law of foreign relations.

Second, the court addresses the preclusive effect of the 1951 Treaty of Peace with Japan on a subset of the actions before the court, namely, those brought by plaintiffs who were United States or allied soldiers in World War II captured by Japanese forces and held as prisoners of war. The court concludes that the 1951 treaty constitutes a waiver of such claims.

This order does not address the pending motions to dismiss in cases brought by plaintiffs who were not members of the armed forces of the United States or its allies. Since these plaintiffs are not citizens of countries that are signatories of the 1951 treaty, their claims raise a host of issues not presented by the Allied POW cases and, therefore, require further consideration in further proceedings.

### II

■ Defendants may remove to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 USC § 1441(a). "The propriety of removal thus depends on whether the case originally could have been filed in federal court." *Chicago v. International College of Surgeons*, 522 U.S. 156, 163, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997).

■ Federal courts have original jurisdiction over cases "arising under the

Constitution, laws or treaties of the United States." 28 USC § 1331. For purposes of removal, federal question jurisdiction exists "only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Since a defense is not part of a plaintiff's properly pleaded statement of his claim, a case may not be removed to federal court on the basis of a federal defense. *Rivet v. Regions Bank of La.,* 522 U.S. 470, 475, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998).

■ Defendants' assertion of the Treaty of Peace with Japan as a defense to plaintiffs' state law causes of action does not, therefore, confer federal jurisdiction. Recognizing this, defendants rely on a line of cases committing to federal common law questions implicating the foreign relations of the United States.

In *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 425, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), a case in which federal jurisdiction was based on diversity of citizenship, the Supreme Court held that development and application of the act of state doctrine was a matter of federal common law, notwithstanding the general rule of *Erie R Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), that federal courts apply state substantive law in diversity cases. The court reasoned that because the doctrine concerned matters of comity between nations, "the problems involved are uniquely federal in nature." *Id.* at 424, 84 S.Ct. 923. Although the applicable state law mirrored federal decisions, the Court was "constrained to make it clear that an issue [involving] our relationships with other members of the international community must be treated exclusively as an aspect of federal law." *Id.* at 425, 84 S.Ct. 923.

■ Under *Banco Nacional,* federal common law governs matters concerning the foreign relations of the United States. See *Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 641, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981). "In these instances, our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the *** international nature of the controversy makes it inappropriate for state law to control." *Id.*

■ If an examination of the complaint shows that the plaintiff's claims necessarily require determinations that will directly and significantly affect United States foreign relations, a plaintiff's state law claims should be removed. *Republic of Philippines v. Marcos,* 806 F.2d 344, 352 (2d Cir.1986). This doctrine has been extended to disputes between private parties that implicate the "vital economic and sovereign interests" of the nation where the parties' dispute arose. *Torres v. Southern Peru Copper Corp.,* 113 F.3d 540, 543 n. 8 (5th Cir.1997).

■ The court concludes that the complaints in the instant cases, on their face, implicate the federal common law of foreign relations and, as such, give rise to federal jurisdiction. Plaintiffs' claims arise out of world war and are enmeshed with the momentous policy choices that arose in the war's aftermath. The cases implicate the uniquely federal interests of the United States to make peace and enter treaties with foreign nations. As the United States has argued as amicus curiae, these cases carry potential to unsettle half a century of diplomacy.

After a thorough analysis, Judge Baird in the Central District of California denied remand in one of the cases now before the undersigned pursuant to the multidistrict litigation transfer order. *Poole v. Nippon Steel Corp,* No 00–0189 (CDCal March 17, 2000). The court agrees with the analysis and the conclusion in that case.[1] Judge

---

1. In another related case in which remand was granted, *Jeong v. Onoda Cement Co,* Ltd, 2000 USDist LEXIS 7985 (CDCal May 18, 2000), the court did not consider the federal common law of foreign relations as a basis for federal jurisdiction.

Baird held: "[T]his case, on its face, presents substantial issues of federal common law dealing with foreign policy and relations. *** As such, plaintiffs may not evade this Court's jurisdiction by cloaking their complaints in terms of state law." The motions for remand are DENIED.

### III

In addressing the motions to dismiss, the court refers again to a complaint that is representative of the actions by United States and Allied POWs, *King v. Nippon Steel Corp.*, No 99–5042.

As noted at the outset of this order, plaintiff King seeks redress for wrongs inflicted by his captors half a century ago. In count one of the complaint, he asserts a claim under California Code of Civil Procedure § 354.6, a new law that permits an action by a "prisoner-of-war of the Nazi regime, its allies or sympathizers" to "recover compensation for labor performed as a Second World War slave labor victim *** from any entity or successor in interest thereof, for whom that labor was performed ***." CalCode CivPro § 354.6. Count two is an unjust enrichment claim in which plaintiff seeks disgorgement and restitution of economic benefits derived from his labor. In count three, plaintiff seeks damages in tort for battery, intentional infliction of emotional distress and unlawful imprisonment. Count four alleges that defendant's failure to reveal its prior exploitation of prisoner labor to present-day customers in California and elsewhere constitutes an unfair business practice under California Business and Professions Code § 17204.

Defendants move pursuant to Federal Rule of Civil Procedure 12(c) for a judgment on the pleadings, arguing: (1) plaintiff's claims are barred by the Treaty of Peace with Japan; (2) plaintiff's claims raise nonjusticiable political questions; (3) the peace treaty, the War Claims Act of 1948 and the federal government's plenary authority over foreign affairs combine to preempt plaintiff's claims and (4) because the complaint alleges injuries caused by the Japanese government, plaintiff's claims are barred by the act of state doctrine and the Foreign Sovereign Immunities Act.

■ These arguments, and King's countervailing positions, arise in all of the cases before the court brought on behalf of Allied POWs against Japanese corporations. The court need not address all of them. For the reasons stated below, the court concludes that plaintiffs' claims are barred by the Treaty of Peace with Japan.

### A

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is the proper means to challenge the sufficiency of the complaint after an answer has been filed. Depending on the procedural posture of the individual case, some defendants have filed motions pursuant to FRCP 12(c) and others have filed motions to dismiss pursuant to FRCP 12(b). The distinction in the present context is not important. In the Ninth Circuit, the standard by which the district court must determine Rule 12(c) motions is the same as the standard for the more familiar motion to dismiss under Rule 12(b)(6): "A district court will render a judgment on the pleadings when the moving party clearly establishes on the face of the pleadings [and by evidence of which the court takes judicial notice] that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 132 F.3d 526, 529 (9th Cir.1997) (citations omitted).

### B

The Treaty of Peace with Japan was signed at San Francisco on September 8, 1951, by the representatives of the United States and 47 other Allied powers and Japan. Treaty of Peace with Japan, [1952] 3 UST 3169, TIAS No 2490 (1951). President Truman, with the advice and consent of the Senate, ratified the treaty and it became effective April 28, 1952. Id.

Article 14 provides the terms of Japanese payment "for the damage and suffering caused by it during the war." Id. at Art. 14(a). For present purposes, the salient features of the agreement are: (1) a grant of authority of Allied powers to seize Japanese property within their jurisdiction at the time of the treaty's effective date; (2) an obligation of Japan to assist in the rebuilding of territory occupied by Japanese forces during the war and (3) *waiver* of all "other claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war ***." Id. at Art. 14(a)–(b) (emphasis added).

It is the waiver provision that defendants argue bars plaintiffs' present claims. In its entirety, the provision reads:

> (b) Except as otherwise provided in the present Treaty, the Allied Powers waive all reparations claims of the Allied Powers, other claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war, and claims if the Allied Powers for direct military costs of occupation.

Id. at Art. 14(b).

On its face, the treaty waives "all" reparations and "other claims" of the "nationals" of Allied powers "arising out of any actions taken by Japan and its nationals during the course of the prosecution of the war." The language of this waiver is strikingly broad, and contains no conditional language or limitations, save for the opening clause referring to the provisions of the treaty. The interests of Allied prisoners of war are addressed in Article 16, which provides for transfer of Japanese assets in neutral or enemy jurisdictions to the International Committee of the Red Cross for distribution to former prisoners and their families. Id. at Art. 16. The treaty specifically exempts from reparations, furthermore, those Japanese assets resulting from "the resumption of trade and financial relations subsequent to Sep-

tember 2, 1945." Id. at Art. 14(a)(2)(II)(iv).

To avoid the preclusive effect of the treaty, plaintiffs advance an interpretation of Article 14(b) that is strained and, ultimately, unconvincing. Although the argument has several shades, it comes down to this: the signatories of the treaty did not understand the Allied waiver to apply to prisoner of war claims because the provision did not expressly identify such claims, in contrast to the corresponding Japanese waiver provision of Article 19. Article 19(b) states that the Japanese waiver includes "any claims and debts arising in respect to Japanese prisoners of war and civilian internees in the hands of the Allied Powers ***."

That the treaty is more specific in Article 19 does not change the plain meaning of the language of Article 14. If the language of Article 14 were ambiguous, plaintiffs' *expressio unius* argument would have more force. But plaintiffs cannot identify any ambiguity in the language of Article 14. To do so would be to inject hidden meaning into straightforward text.

The treaty by its terms adopts a comprehensive and exclusive settlement plan for war-related economic injuries which, in its wholesale waiver of prospective claims, is not unique. See, for example, *Neri v. United States*, 204 F.2d 867 (2d Cir.1953) (claim barred by broad waiver provision in Treaty of Peace with Italy). The waiver provision of Article 14(b) is plainly broad enough to encompass the plaintiffs' claims in the present litigation.

C

■ The court does not find the treaty language ambiguous, and therefore its analysis need go no further. *Chan v. Korean Air Lines*, 490 U.S. 122, 134, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989) (if text of treaty is clear, courts "have no power to insert an amendment."). To the extent that Articles 19(b) raises any uncertainty, however, the court "may look beyond the written words to the history of the treaty,

the negotiations, and the practical construction adopted by the parties." *Air France v. Saks,* 470 U.S. 392, 396, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). These authorities are voluminous and therefore of doubtful utility due to the potential for misleading selective citation. Counsel for both sides have proved themselves skilled in scouring these documents for support of their positions, and that both sides have succeeded to a certain degree underscores the questionable value of such resort to drafting history. Nevertheless, the court has conducted its own review of the historical materials, and concludes that they reinforce the conclusion that the Treaty of Peace with Japan was intended to bar claims such as those advanced by plaintiffs in this litigation.

The official record of treaty negotiations establishes that a fundamental goal of the agreement was to settle the reparations issue once and for all. As the statement of the chief United States negotiator, John Foster Dulles, makes clear, it was well understood that leaving open the possibility of future claims would be an unacceptable impediment to a lasting peace:

Reparation is usually the most controversial aspect of peacemaking. The present peace is no exception.

On the one hand, there are claims both vast and just. Japan's aggression caused tremendous cost, losses and suffering. ***

On the other hand, to meet these claims, there stands a Japan presently reduced to four home islands which are unable to produce the food its people need to live, or the raw materials they need to work. ***

Under these circumstances, if the treaty validated, or kept contingently alive, monetary reparations claims against Japan, her ordinary commercial credit would vanish, the incentive of her people would be destroyed and they would sink into a misery of body and spirit that would make them easy prey to exploitation. ***

There would be bitter competition [among the Allies] for the largest possible percentage of an illusory pot of gold.

See U.S. Dept of State, Record of Proceedings of the Conference for the Conclusion and Signature of the Treaty of Peace with Japan 82–83 (1951) (DefReq for Judicial Notice, Exh I).

The policy of the United States that Japanese liability for reparations should be sharply limited was informed by the experience of six years of United States-led occupation of Japan. During the occupation the Supreme Commander of the Allied Powers (SCAP) for the region, General Douglas MacArthur, confiscated Japanese assets in conjunction with the task of managing the economic affairs of the vanquished nation and with a view to reparations payments. See SCAP, Reparations: Development of Policy and Directives (1947). It soon became clear that Japan's financial condition would render any aggressive reparations plan an exercise in futility. Meanwhile, the importance of a stable, democratic Japan as a bulwark to communism in the region increased. At the end of 1948, MacArthur expressed the view that "[t]he use of reparations as a weapon to retard the reconstruction of a viable economy in Japan should be combated with all possible means" and "recommended that the reparations issue be settled finally and without delay." Memorandum from General Headquarters of SCAP to Department of the Army (Dec. 14, 1948) at ¶ 8 (DefReq for Judicial Notice, Exh E).

That this policy was embodied in the treaty is clear not only from the negotiations history but also from the Senate Foreign Relations Committee report recommending approval of the treaty by the Senate. The committee noted, for example:

Obviously insistence upon the payment of reparations in any proportion commensurate with the claims of the injured countries and their nationals would wreck Japan's economy, dissipate any

credit that it may possess at present, destroy the initiative of its people, and create misery and chaos in which the seeds of discontent and communism would flourish. In short, [it] would be contrary to the basic purposes and policy of *** the United States ***.

Japanese Peace Treaty and Other Treaties Relating to Security in the Pacific, SRep No 82–2, 82d Cong, 2d Sess 12 (1952) (DefReq for Judicial Notice, Exh F). The committee recognized that the treaty provisions "do not give a direct right of return to individual claimants except in the case of those having property in Japan," id at 13, and endorsed the position of the State Department that "United States nationals, whose claims are not covered by the treaty provisions *** must look for relief to the Congress of the United States," id at 14.

Indeed, the treaty went into effect against the backdrop of congressional response to the need for compensation for former prisoners of war, in which many, if not all, of the plaintiffs in the present cases participated. See War Claims Act of 1948, 50 USC §§ 2001–2017p (establishing War Claims Commission and assigning top priority to claims of former prisoners of war).

Were the text of the treaty to leave any doubt that it waived claims such as those advanced by plaintiffs in these cases, the history of the Allied experience in post-war Japan, the drafting history of the treaty and the ratification debate would resolve it in favor of a finding of waiver.

## D

As one might expect, considering the acknowledged inadequacy of compensation for victims of the Japanese regime provided under the treaty, the issue of additional reparations has arisen repeatedly since the adoption of that agreement some 50 years ago. This is all the more understandable in light of the vigor with which the Japanese economy has rebounded from the abyss.

The court finds it significant, as further support for the conclusion that the treaty bars plaintiffs' claims, that the United States, through State Department officials, has stood firmly by the principle of finality embodied in the treaty. This position was expressed in recent congressional testimony by Ronald J Bettauer, deputy legal advisor, as follows:

The 1951 Treaty of Peace with Japan settles all war-related claims of the U.S. and its nationals, and precludes the possibility of taking legal action in United States domestic courts to obtain additional compensation for war victims from Japan or its nationals—including Japanese commercial enterprises.

POW Survivors of the Bataan Death March, Hearing before the Senate Committee on the Judiciary (June 28, 2000) (statement of Ronald J Bettauer, United States Department of State) (DefReq for Judicial Notice, Exh P).

In another recent example, in response to a letter from Senator Orrin Hatch expressing "disappointment" with the "fifty-five year old injustice imposed on our military forces held as prisoners of war in Japan" and urging the Secretary of State to take action, a State Department representative wrote:

The Treaty of Peace with Japan has, over the past five decades, served to sustain U.S. security interests in Asia and to support peace and stability in the region. We strongly believe that the U.S. must honor its international agreements, including the [treaty]. There is, in our view, no justification for the U.S. to attempt to reopen the question of international commitments and obligations under the 1951 Treaty in order now to seek a more favorable settlement of the issue of Japanese compensation.

This explanation obviously offers no consolation to the victims of Japanese wartime aggression. Regrettably, however, it was impossible when the Treaty was negotiated—and it remains impossible today, 50 years later—to compensate fully for the suffering visited upon the victims of the war ***.

Letter of Jan 18, 2000, from U.S. Dept of State to The Hon Orrin Hatch at 2.

The conclusion that the 1951 treaty constitutes a waiver of the instant claims, as stated above and argued in the brief of the United States as amicus curiae in this case, carries significant weight. See *Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight."); *Sullivan v. Kidd*, 254 U.S. 433, 442, 41 S.Ct. 158, 65 L.Ed. 344 (1921) ("[T]he construction placed upon the treaty before us and consistently adhered to by the Executive Department of the Government, charged with the supervision of our foreign relations, should be given much weight."). The government's position also comports entirely with the court's own analysis of the treaty and its history.

Plaintiffs raise several additional arguments that bear only brief mention. First is the characterization of these claims as not arising out of the "prosecution of the war," as that phrase is used in the treaty. Plaintiffs attempt to cast their claims as involving controversies between private parties.

It is particularly far-fetched to attempt to distinguish between the conduct of Imperial Japan during the Second World War and the major industry that was the engine of its war machine. The lack of any sustainable distinction is apparent from the complaints in these cases. For example, the *King* complaint alleges that a class of war prisoners were forced to work "in support of the Japanese war effort," Compl ¶ 56, and pursuant to a directive from the Japanese government that the "'labor and technical skill'" of prisoners of war "'be fully utilized for the replenishment of production, and contribution rendered toward the prosecution of the Greater East Asiatic War,'" id at ¶ 30. Furthermore, the complaint asserts that plaintiff worked in a factory "where motor armatures were manufactured for the war effort." Id. at ¶ 35. These allegations quite clearly bring this action within the scope of the treaty's waiver of all claims "arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war." Treaty at Art. 14(b).

■ Plaintiffs also argue that waiver of plaintiffs' claims renders the treaty unconstitutional and invalid under international law. This position is contrary to the well-settled principle that the government may lawfully exercise its "sovereign authority to settle the claims of its nationals against foreign countries." *Dames & Moore v. Regan*, 453 U.S. 654, 679–80, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); see also *Neri*, 204 F.2d at 868–69 (enforcing treaty waiver of reparations claims).

■ Finally, plaintiffs assert that subsequent settlements between Japan and other treaty signatories on more favorable terms than those set forth in the treaty should "revive" plaintiff's claims under Article 26, which provides in relevant part:

> Should Japan make a *** war claims settlement with any State granting that State greater advantages than those provided by the present Treaty, those same advantages shall be extended to the parties to the present Treaty.

Treaty at Art. 26. Without deciding whether the evidence plaintiff cites of other agreements implicates Article 26, the court finds that that provision confers rights *only* upon the "parties to the present treaty," i.e., the government signatories. The question of enforcing Article 26 is thus for the United States, not the plaintiffs, to decide.

## IV

The Treaty of Peace with Japan, insofar as it barred future claims such as those asserted by plaintiffs in these actions, exchanged full compensation of plaintiffs for a future peace. History has vindicated the wisdom of that bargain. And while full compensation for plaintiffs' hardships, in

the purely economic sense, has been denied these former prisoners and countless other survivors of the war, the immeasurable bounty of life for themselves and their posterity in a free society and in a more peaceful world services the debt.

The motions to dismiss and/or for judgment on the pleadings are GRANTED. The clerk shall enter judgment in favor of defendants in the above-captioned cases.

IT IS SO ORDERED.