# Constitutionality of the Rohrabacher Amendment

The Rohrabacher Amendment, which imposes a funding restriction on the Justice Department's ability to litigate matters relating to the Treaty of Peace with Japan, violates established separation of powers principles and, therefore, is unconstitutional.

July 25, 2001

MEMORANDUM OPINION FOR THE SENIOR ASSOCIATE COUNSEL TO THE PRESIDENT AND LEGAL ADVISER TO THE NATIONAL SECURITY COUNCIL

You have asked for the Office of Legal Counsel's views on the constitutional issues posed by Representative Dana Rohrabacher's amendment ("Rohrabacher Amendment") to H.R. 2500, the Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, FY 2002 (commonly referred to as "CJS Bill"). For the reasons set forth more fully below, we conclude that the Rohrabacher Amendment violates established separation of powers principles and, therefore, is unconstitutional.

## I. Introduction

The Rohrabacher Amendment passed the House of Representatives on July 18, 2001, by a 395-33 vote, *see* 147 Cong. Rec. H4195 (daily ed. July 18, 2001), and is set forth in section 801 of title VIII ("Additional General Provisions") of the CJS Bill. The Rohrabacher Amendment reads as follows:

> Sec. 801. None of the funds made available in this Act may be used by the Department of Justice or the Department of State to file a motion in any court opposing a civil action against any Japanese person or corporation for compensation or reparations in which the plaintiff alleges that, as an American prisoner of war during World War II, he or she was used as slave or forced labor.

*Id.* at H4168.

## II. General Constitutional Principles

The Rohrabacher Amendment is a restraint on spending, and thus is an exercise of Congress's power of the purse—a legislative authority central to the Constitution's scheme of separated powers.[1] Indeed, in a very early debate in the House of

---

[1] The Constitution delegates to Congress the power to raise revenue and to appropriate it for the activities of the federal government, U.S. Const. art. I, § 8, cl. 1, and it expressly prohibits federal expenditures except "in Consequence of Appropriations made by Law," *id.* art. I, § 9, cl. 7. The Supreme Court has emphasized the breadth and significance of these core congressional powers. *See,*

Representatives, James Madison described Congress's power of the purse as "the great bulwark which our Constitution had carefully and jealously established against Executive usurpations." 3 Annals of Cong. 938 (Mar. 1, 1793); *see also The Federalist* No. 58, at 327 (James Madison) (Clinton Rossiter ed., 1999) (the power of the purse is "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people"). The Executive Branch has accordingly long recognized that even where the President has the independent constitutional authority to take some action, the availability of funds depends on the existence of a relevant appropriations provision.[2] "Congress holds the purse strings, and it may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted and impose conditions in respect to its use."[3]

On the other hand, even with due recognition of Congress's broad spending powers, the Executive Branch has also insisted that those powers may not be used to subvert the basic constitutional scheme for allocating federal powers among the three branches of the government. *See Mutual Security Program—Cutoff of Funds from Office of Inspector General and Comptroller*, 41 Op. Att'y Gen. 507, 530 (1960) ("[T]he Constitution does not permit any indirect encroachment by Congress upon th[e] authority of the President through resort to conditions attached to appropriations.").[4] The Executive Branch's insistence on this principle is long-standing. In 1860, President Buchanan issued a signing statement denying Congress's power to interfere with his authority to issue orders to military officers through the device of a condition on the availability of appropriated funds. The

---

*e.g.*, *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978); *see also The Floyd Acceptances*, 74 U.S. (7 Wall.) 666, 676-77 (1868) (Executive may not supply army through advances of payments to military contractors without statutory authorization). Congress's control over public spending has centuries-old legal and constitutional roots: "The histories of parliaments are largely the accounts of how representative assemblies of the people, or some strata of the people, came to terms with kings and lords and priests by gradually acquiring control over the disposition of their own and the nation's wealth." James Burnham, *Congress and the American Tradition* 207 (1959).

[2] *See, e.g.*, *Expense of Presents to Foreign Governments—How Defrayed*, 4 Op. Att'y Gen. 358, 359 (1845) (in "the conduct of our foreign relations," the Executive "cannot exceed the amount . . . appropriated").

[3] *Constitutionality of Proposed Legislation Affecting Tax Refunds*, 37 Op. Att'y Gen. 56, 61 (1933).

[4] *See also Constitutionality of Proposed Legislation Affecting Tax Refunds*, 37 Op. Att'y Gen. at 61 ("Congress may not, by conditions attached to appropriations, provide for a discharge of the functions of Government in a manner not authorized by the Constitution. If such a practice were permissible, Congress could subvert the Constitution."); William H. Taft, *The Boundaries Between the Executive, the Legislative, and the Judicial Branches of the Government*, 25 Yale L.J. 599, 612 (1916) (discussing incident during President Taft's Administration in which the President instructed his subordinates to disregard an appropriations limitation as an unconstitutional interference with the President's responsibilities); David P. Currie, *Rumors of Wars: Presidential and Congressional War Powers, 1809-1829*, 67 U. Chi. L. Rev. 1, 22 (2000) (footnote omitted) (the fact that "the appropriation power was intended as a check on Presidential authority does not prove it can be used to compel the President to take action he has discretion to decline").

President therefore construed the statute at issue not to work such an interference. *See* Signing Statement of President Buchanan to the House of Representatives (1860), *reprinted in* 7 *A Compilation of the Messages and Papers of the Presidents* 3128 (James D. Richardson ed., 1897).[5] Since that time, the Executive Branch has consistently denied the binding effect of appropriations conditions that violate the constitutional separation of powers or that usurp the President's constitutional authority. *See, e.g.*, *Bill to Relocate United States Embassy from Tel Aviv to Jerusalem*, 19 Op. O.L.C. 123, 125 (1995) ("Jerusalem Opinion") (bill conditioning spending authority on relocation of embassy was unconstitutional where it would "trammel the President's constitutional authority" over negotiation and recognition).

Of particular relevance here, the Executive Branch has found that funding prohibitions denying it any ability to communicate to the federal courts its views on legal questions central to its responsibilities may give rise to "serious constitutional problems." *The Effect of an Appropriations Rider on the Authority of the Justice Department to File a Supreme Court Amicus Brief*, 14 Op. O.L.C. 13, 19 (1990).[6] Accordingly, we must examine the Rohrabacher Amendment carefully in order to determine whether it is an impermissible, albeit indirect, violation of separation of powers principles.

---

[5] The views expressed in the signing statement were subsequently reviewed and endorsed by an opinion the President requested from Attorney General Black. The Attorney General wrote that "[i]f Congress had really intended to [interfere with the President's command authority], that purpose could not be accomplished in this indirect manner any more than if it was attempted directly." *Memorial of Captain Meigs*, 9 Op. Att'y Gen. 462, 469 (1860).

[6] As Representative Christopher Cox pointed out during the House debate over the Rohrabacher Amendment, "[d]uring the Reagan Administration, the Department of Justice regularly advised Congress of its constitutional concerns over the so-called Rudman Amendment, a funding bar annually added by Congress that purported to bar the President from spending appropriated funds to advocate in court the view that the antitrust laws did not bar vertical non-price restraints. The Justice Department believed that the Rudman Amendment represented an attempt to accomplish indirectly through the appropriations power that [which] Congress could not, consistent with the Constitution, accomplish directly through legislation—namely, to tell the President how to 'take Care that the laws (in this case, the antitrust laws) be faithfully executed.'" 147 Cong. Rec. at H4170 (remarks of Rep. Cox). Representative Cox added that the Rohrabacher Amendment "appears to raise a still more serious constitutional question, because in addition to attempting to use the appropriations power indirectly to control the executive branch's interpretation of statutes pursuant to the Take Care Clause, it also attempts indirectly to use the appropriations power to control the President's exercise of the Foreign Affairs Power—a power he enjoys directly under the Constitution, and not by grant of delegated legislative authority." *Id*.

The views of the Justice Department relating to antitrust enforcement to which Representative Cox referred are set forth in, e.g., Memorandum for William F. Baxter, Assistant Attorney General, Antitrust Division, from Ralph W. Tarr, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Scope of Limitation Imposed by Appropriations Act Provision Relating to Resale Price Maintenance* (Dec. 2, 1983). In a signing statement dated November 28, 1983, President Ronald Reagan expressed "strong reservations about the constitutional implications" of the funding restriction. Statement on Signing a Fiscal Year 1984 Appropriations Bill, 2 *Pub. Papers of Pres. Ronald Reagan* 1627, 1627 (Nov. 28, 1983).

### III. The Rohrabacher Amendment

The Rohrabacher Amendment is addressed to particular consolidated cases brought in United States courts by former members of the United States Armed Services against Japanese nationals and corporations, based on claims that the plaintiffs were used for slave labor or forced labor during the Second World War while they were prisoners of war of Japan. The claims arise despite the fact that the Treaty of Peace with Japan appears to bar them. *See* Treaty of Peace with Japan art. 14, Sept. 8, 1951, 3 U.S.T. 3169, 3180-83 (the "Peace Treaty" or "Treaty"). Article 14(a) of the Peace Treaty establishes the terms of Japan's reparations to the Allied Powers "for the damage and suffering caused by it during the war." After prescribing how such reparations are to be paid, Article 14(b) of the Peace Treaty provides as follows (emphases added):

> Except as otherwise provided in the present Treaty, the Allied Powers waive all reparations claims of the Allied Powers, other claims of the Allied Powers *and their nationals* arising out of any actions taken by Japan *and its nationals* in the course of the prosecution of the war, and claims of the Allied Powers for direct military costs of occupation.

In a recent decision rejecting the claims to compensation by Americans who were prisoners of war of Japan, a federal district court held:

> The treaty by its terms adopts a comprehensive and exclusive settlement plan for war-related economic injuries which, in its wholesale waiver of prospective claims, is not unique. . . . The waiver provision of Article 14(b) is plainly broad enough to encompass the plaintiffs' claims in the present litigation.

*In re World War II Era Japanese Forced Labor Litigation*, 114 F. Supp. 2d 939, 945 (N.D. Cal. 2000).

Pursuant to the Executive Branch's constitutional responsibilities to interpret and uphold treaties, to conduct foreign relations, and to execute the law, the federal government filed "Statements of Interest" at various times in this litigation. *See, e.g.*, Statement of Interest of United States of America (Aug. 17, 2000), *In re World War II Era Japanese Forced Labor Litigation*, 114 F. Supp. 2d 939 (N.D. Cal. 2000) (No. MDL-1347), *available at* http://www.state.gov/s/l/c8185.htm (last visited May 23, 2012). The government took the position that

> [t]he United States must honor its international agreements, including the Peace Treaty with Japan. There is, in our view, no basis for the U.S. or Allied citizens to reopen the question of international

commitments and obligations under the 1951 Treaty. It is the United States' position that the claims of the United States, its nationals and Allied nationals against Japan and its nationals arising out of their conduct during the war were finally settled by the Treaty of Peace with Japan in 1951.

*Id*. at 2-3.

The intent of the Rohrabacher Amendment is apparently to prevent the Executive Branch from expressing to the courts its view of the Peace Treaty in the consolidated cases captioned *In re World War II Era Japanese Forced Labor Litigation*. Thus, Representative Rohrabacher stated, "I would hope that we can put this type of restriction into this bill that would prevent the State Department from using any funds that we authorize and appropriate today in order to prevent our POWs from suing the Japanese corporations that used them as slave labor in the Second World War." 147 Cong. Rec. at H4169.

### IV. Analysis

In our opinion, there are at least two interlinked kinds of separation of powers problems in the Rohrabacher Amendment—the first kind relating to its effect on the Judiciary, the second kind to its effect on the Executive.

First, the Rohrabacher Amendment impermissibly impairs the ability of the federal courts to perform the judicial functions of interpreting the Peace Treaty and of adjudicating claims that appear to be barred by the waiver in Article 14(b) of that Treaty. It does this by attempting to prevent the Executive Branch from articulating to the courts its understanding of a treaty—an understanding on which the courts traditionally rely, and to which they characteristically give great deference. As we shall show, the courts' reliance on, and deference to, Executive Branch treaty interpretations is constitutionally grounded, and reflects the constitutionally assigned roles of the two branches with respect to foreign affairs. By preventing the courts from hearing the Executive's interpretation of the Peace Treaty, therefore, the Rohrabacher Amendment would force the courts to decide a case that implicates sensitive questions of our relationship with a major ally and treaty partner without having the benefit of the Executive's guidance and special expertise. The outcome at once impedes the courts from performing their constitutional role of adjudicating cases or controversies, and accords the courts a role in foreign policy decisionmaking that they do not properly have.

Second, the Rohrabacher Amendment impermissibly impairs the Executive Branch's ability to carry out the core constitutional responsibilities relating to treaties, while also seeking to direct and control the Executive in the performance of its exclusive functions. In particular, it prevents the Executive from articulating

and defending its interpretation of the Peace Treaty, while also attempting to induce the Executive and the courts to accept Congress's preferred interpretation.

Underlying both types of separation of powers problems is the basic constitutional principle of presidential primacy in the conduct of foreign affairs—a principle that the Supreme Court has repeatedly recognized. *See, e.g.*, *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936); *accord Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988); *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 705-06 n.18 (1976); *United States v. Louisiana*, 363 U.S. 1, 35 (1960). The President's constitutional primacy in this area follows from specific textual grants of authority in Article II, including those that make him "Chief Executive, U.S. Const. Art. II, § 1, cl. 1, and . . . Commander in Chief, *id.*, art. II, § 2, cl.1." *Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982). It follows as well from the "unique position" that the President occupies in the constitutional structure. *Id.* at 749.

Of greatest relevance here, the President's foreign relations power includes a broad range of authority with respect to treaties. These include, *inter alia*, responsibility for treaty interpretation and enforcement, and the authority to place the United States in breach of a treaty or even to terminate it, should the President find that advisable.[7] Moreover, the President's authority with respect to treaties intersects with his responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. In consequence, the President's responsibility to take care that the laws be faithfully executed "is, if possible, more imperative" with respect to the execution of treaties than statutes, "since the execution of treaties being connected with public and foreign relations, is devolved upon the executive branch" in a unique manner. *United States v. The Amistad*, 40 U.S. (15 Pet.) 518, 571-72 (1841).[8] It is this special presidential responsibility with respect to treaties that constitutes the basic premise of the analysis that follows.

---

[7] *See* John Yoo, *Politics as Law? The Anti-Ballistic Missile Treaty, The Separation of Powers, and Treaty Interpretation*, 89 Cal. L. Rev. 851, 873-74 (2001) ("Yoo").

[8] *See also Goldwater v. Carter*, 444 U.S. 996, 1000 n.1 (1979) (Powell, J., concurring in judgment) (President has "duty to execute [treaty] provisions"); *Collins v. Weinberger*, 707 F.2d 1518, 1522 (D.C. Cir. 1983) (President has "primary responsibility" for the "[i]nterpretation, clarification and implementation" of international agreements); *Constitutionality of Proposed Conditions to Senate Consent to the Interim Convention on Conservation of North Pacific Fur Seals*, 10 Op. O.L.C. 12, 17 (1986) ("It is indisputable that treaties are among the laws to be executed by the President."); *International Load Line Convention*, 40 Op. Att'y Gen. 119, 123 (1941) ("Attention to the observance of treaties is an executive responsibility"); Restatement (Third) of the Foreign Relations Law of the United States § 112, cmt. c (1990).

Despite the fact that Article II does not enumerate a presidential power to interpret treaties, this function has been recognized from the beginning as belonging to the President. When the question arose concerning the proper interpretation of the 1778 Treaty of Alliance with France, President Washington issued the 1793 Neutrality Proclamation construing the Treaty not to require United States entry into the European wars on France's side. Alexander Hamilton defended President Washington's authority to interpret the Franco-American Treaty by arguing that this power stemmed from his control

## A.

As the Supreme Court has repeatedly acknowledged, the Executive Branch's interpretations of treaties must be accorded substantial judicial deference. *See, e.g.*, *El Al Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168 (1999) ("'Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.'") (quoting *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982)).[9] Such judicial deference is a reflection of the general constitutional principle discussed above—that the primary responsibility for upholding and enforcing treaties, and more generally for conducting foreign policy, lies with the President. *See United States v. Li*, 206 F.3d 56, 67 (1st Cir. 2000) (Selya, J., concurring) (deference to Executive's treaty interpretation is owed in part because "when foreign affairs are involved, the national interest has to be expressed through a single authoritative voice"). Reliance on the Executive Branch's interpretation of a treaty serves at least four constitutionally significant purposes: (1) it helps the courts to avoid becoming the unwitting causes of friction between the United States and its treaty partners (or other nations); (2) it averts the embarrassments to the United States that would ensue if different branches of our government spoke with contradictory voices on crucial questions of treaty interpretation;[10] (3) it helps to ensure consistency and uniformity of interpretations within the Judicial Branch itself; and (4) it provides the courts with the Executive's expertise on legal or diplomatic views or practices with which courts may well be unfamiliar.[11] All four of these considerations supporting judicial reliance on the Executive in treaty cases derive ultimately from the Constitution's allocation of responsibilities within the federal government and the specific institutional competences that the Framers designed each branch to develop.[12]

The Rohrabacher Amendment would, however, effectively silence the Executive Branch if it attempted to articulate its interpretation of the Peace Treaty in

---

over the treaty process and the general vesting of the executive power in Article II, Section 1. *See* Alexander Hamilton, Pacificus No. 1 (1793), *reprinted in* 15 *The Papers of Alexander Hamilton* 32 (Harold C. Syrett et al. eds., 1969); *see also* Yoo, 89 Cal. L. Rev. at 895-901.

[9] *See also Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961); *Factor v. Laubenheimer*, 290 U.S. 276, 295 (1933); *Charlton v. Kelly*, 229 U.S. 447, 468 (1913); *Mendaro v. World Bank*, 717 F.2d 610, 620 (D.C. Cir. 1983).

[10] *Cf. Baker v. Carr*, 369 U.S. 186, 217 (1962).

[11] Thus, the courts recognize that although they "are well equipped to resolve questions of domestic law," they "venture into unfamiliar territory" when interpreting treaties negotiated with foreign governments. *More v. Intelcom Support Servs., Inc.*, 960 F.2d 466, 472 (5th Cir. 1992).

[12] *Cf. Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964) (the Act of State doctrine has "'constitutional' underpinnings" because it "arises out of the basic relationships between branches of government in a system of separation of powers" and "concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations").

cases in which the courts were adjudicating claims that the Treaty appears to bar. Apart from its effects on the *Executive's* constitutional functions (which we discuss in Part IV.B below), the provision would impair the *Judiciary's* ability to fulfill its "primary mission" of interpreting the law in the cases or controversies before it. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001). In *Velazquez*, a First Amendment case involving a funding restriction on the activities of the Legal Services Corporation ("LSC"), the Court stressed that the bar on the LSC's ability to present certain types of claims and arguments operated to impair the courts' ability to adjudicate cases as "[a]n informed, independent judiciary." *Id*. The Court stated that, under the challenged restriction, "cases would be presented by LSC attorneys who could not advise the courts of serious questions of statutory validity . . . . By seeking to prohibit the analysis of certain legal issues and to truncate presentation to the courts, the enactment under review prohibits speech and expression upon which courts must depend for the proper exercise of the judicial power." *Id*.

In view of the traditional reliance of the courts on the Executive Branch's interpretation of treaties—a reliance that, as we have shown, is dictated by the Constitution's allocation of responsibilities to the two branches—we think that the Rohrabacher Amendment, like the funding restriction invalidated in *Velazquez*, impermissibly impairs "the proper exercise of the judicial power."

Paradoxically, the Rohrabacher Amendment not only *weakens* the Judiciary's ability to perform its primary constitutional function, but also *augments* the Judiciary's power in a manner that is incompatible with the Constitution's distribution of governmental powers. As a general proposition, it is fair to say that the courts will frequently decline to decide questions involving foreign relations, or will defer to the Executive Branch when they do decide them, in order to avoid embarrassing the Executive Branch in the conduct of foreign policy.[13] That is to say, the courts themselves are aware that the over-judicialization of foreign policy disputes may cause the United States to speak to foreign nations with contradictory voices, and so undermine the Executive Branch's ability to conduct foreign relations. Under the Rohrabacher Amendment, however, the courts would be deciding a question of the utmost importance to the relations between the United States and Japan, despite the fact that the Executive Branch would be barred from informing them of its views of the Treaty of Peace with Japan or of the consequences of our breaching it. To invite the courts to play such a role, without the benefit of hearing the Executive Branch's view, is to disrupt the "proper distribu-

---

[13] *See, e.g., Baker v. Carr*, 369 U.S. at 211-14; *see also American Foreign Service Ass'n v. Garfinkel*, 490 U.S. 153, 161 (1989) (per curiam) (instructing lower courts "not [to] pronounce upon the relative constitutional authority of Congress and the Executive branch [in a case involving national security] unless [they] find[] it imperative to do so"); *Goldwater v. Carter*, 444 U.S. at 1003 (Rehnquist, J., concurring in judgment) (question whether unilateral treaty termination power belonged to President was non-justiciable in part because "it involves foreign relations").

tion of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." *Sabbatino*, 376 U.S. at 427-28.

## B.

As well as impairing the courts' ability to exercise judicial power, the Rohrabacher Amendment also impermissibly impairs the Executive Branch's performance of core constitutional functions with respect to treaties, while at the same time seeking to aggrandize Congress's authority over the same area. Either type of interference—preventing a coordinate branch from performing a function that the Constitution assigns to it, or seeking to direct and control another branch in the performance of such a function—is a violation of separation of powers doctrine.[14]

The Rohrabacher Amendment would prohibit the Executive Branch from informing the courts of its interpretation of the Peace Treaty, but only if the Executive "oppos[es]" the plaintiffs in the covered civil actions. In effect, therefore, Congress would be requiring the Executive Branch either to present *no* interpretation of the Treaty to the courts, or else to advocate the plaintiffs'—i.e., *Congress's*—interpretation of it. Forcing the Executive to choose between these alternatives is a violation of separation of powers principles. Insofar as Congress is silencing the Executive Branch, it is *impairing* the Executive's ability to perform a central constitutional function. And insofar as Congress is seeking to direct the Executive Branch to advocate *Congress's* interpretation of the treaty, it is *usurping* a constitutional power that does not belong to it.[15] True, Congress may *abrogate* treaties,[16] but it has no constitutional power whatever to insist, through legislation,

---

[14] Interferences by one branch with another branch's functioning in violation of separation of powers can take one of two basic forms. First, "it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996). Thus, where the Legislative or Executive Branch attempts to usurp power constitutionally committed to the other, the attempt is invalid. Second, "[e]ven when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Id*.

[15] The fact that the Rohrabacher Amendment is an exercise of the *spending* power does not shelter it from these separation of powers objections: It has long been recognized that Congress may not invade the President's foreign affairs powers by conditioning funding on the President's exercising his discretionary constitutional powers in a particular manner. Representative Daniel Webster, for example, voiced such arguments in 1826, when opponents of the Panama Congress sought to attach such conditions to the appropriation for the United States mission. *See* Edward S. Corwin, *The President: Offices and Powers* 387-88 n.49 (1940).

[16] "It has been adjudged that Congress by legislation, and so far as the people and authorities of the United States are concerned, could abrogate a treaty made between this country and another country." *La Abra Silver Mining Co. v. United States*, 175 U.S. 423, 460 (1899); *see also United States v. Stuart*, 489 U.S. 353, 375 (1989) (Scalia, J., concurring in part and in the judgment) ("[I]f Congress does not like the interpretation [of] a treaty [that] has been given by the courts or by the President, it may abrogate or amend it as a matter of internal law by simply enacting inconsistent legislation.").

that the other branches advocate or adopt Congress's preferred construction of them.[17] The function of interpreting treaties belongs *only* to the Executive (as well, of course, to the courts when cognizable cases or controversies arise). *Cf. Bowsher v. Synar*, 478 U.S. 714, 733-34 (1986). Thus, whether viewed as an impairment of the Executive's ability to perform its constitutional function of treaty interpretation, or as a usurpation by the Legislative Branch of the interpretative authority belonging solely to the other branches, the Rohrabacher Amendment appears to violate separation of powers principles.[18]

Further, the President's treaty powers also include the authority to enforce a treaty or, should he deem it advisable, to breach or to terminate it.[19] The Rohrabacher Amendment, however, while not abrogating the Peace Treaty, prevents the Executive Branch from upholding the Treaty by defending it in the courts. At the same time, the Amendment also encroaches on the President's authority to breach or terminate the Peace Treaty (again, without deploying Congress's power of abrogation) by seeking to cause an outcome in the litigation over the Treaty that would place the United States in violation of it. For these reasons as well, the Rohrabacher Amendment impermissibly impairs the Executive's constitutional power, while aggrandizing that of Congress.

In sum, then, we conclude that the Rohrabacher Amendment violates established separation of powers principles and is unconstitutional.

SHELDON BRADSHAW
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

ROBERT J. DELAHUNTY
*Special Counsel*
*Office of Legal Counsel*

---

[17] It is clear that the Rohrabacher Amendment does not *abrogate* the Peace Treaty. It seems to presuppose that the courts may consider Treaty-based defenses to the claims of former prisoners of war (and thus that the Treaty remains in effect). But it denies to the Executive Branch the ability to present its views of the Treaty, should they conflict with the views of the plaintiffs.

[18] The constitutional problem we see here is thus similar to the problem we discerned in the Jerusalem Opinion. There, a conditional funding constraint would in effect have forced the President to choose between having no appropriations for embassies or situating the United States embassy to Israel in a place (Jerusalem) which *Congress* rather than the President had designated. To the extent that the provision would have precluded the Executive from maintaining embassies abroad, it constituted an impermissible impairment of the Executive's constitutional power; to the extent that it would have directed the choice of Jerusalem rather than Tel Aviv as the site of the embassy in Israel, it usurped the Executive's sole recognition power, and hence was an impermissible legislative aggrandizement.

[19] *See* Yoo, 89 Cal. L. Rev. at 873-74; John C. Yoo, *Kosovo, War Powers, and the Multilateral Future*, 148 U. Pa. L. Rev. 1673, 1725-29 (2000); *cf. The Paquete Habana*, 175 U.S. 677, 700 (1900).